UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

CIVIL ACTION NO. <u>1:17-cv-334</u>

| | | |
|---|---|---|
| GEOFFREY TURNER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | |
| HENDERSON COUNTY SHERIFF | ) | |
| CHARLES MCDONALD, in his official | ) | COMPLAINT |
| capacity, and JOHN DOE | ) | |
| CORPORATION, in its capacity as | ) | |
| Surety on the Official Bond of the Sheriff | ) | |
| of Henderson County, | ) | |
| | ) | |
| **Defendants.** | ) | |

NOW COMES Plaintiff Geoffrey Turner, requesting a jury trial, and alleges the following as his Complaint against defendant Charles McDonald, in his official capacity as Sheriff of Henderson County, North Carolina:

## INTRODUCTION

1.     Plaintiff Geoffrey Turner served in the United States Army National Guard for 5 years, and he served as a law enforcement officer in the Henderson County Sheriff's Office for over 3 years.  During his employment with the Henderson County Sheriff's Office, Plaintiff was subjected to unlawful discrimination and retaliation and was constructively discharged from his employment because of his disabilities, his history of disabilities, and his being regarded as a person with a disability; because of his request and need for accommodations for his disabilities; because of his military service; and because of his opposition to and complaints of discrimination and harassment.

1

2.      This is a civil action brought to recover damages and equitable relief from Defendant Henderson County Sheriff Charles McDonald, on account of Defendant's unlawful intentional discrimination and retaliation against Plaintiff Geoffrey Turner in violation of the Americans With Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq.*, and the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301 *et seq.*

## JURISDICTION

3.      The court has jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1343.  The federal claims in this lawsuit are authorized and instituted pursuant to § 107(a) of the ADA, 42 U.S.C. § 1211(7)(a), and 38 U.S.C. § 4323(b)(3).

4.      On or about August 17, 2015, Plaintiff Geoffrey Turner timely filed a Charge of Discrimination against the Henderson County Sheriff's Office with the Equal Employment Opportunity Commission ("EEOC"), designated as EEOC Charge No. 430-2015-01926, complaining of disability discrimination and retaliation in violation of the ADA.

5.      On or about September 8, 2017, the EEOC issued a Notice of Right to Sue to Plaintiff Geoffrey Turner.

6.      This action is filed within ninety days of September 8, 2017.

7.      Plaintiff has exhausted all his administrative remedies.

## VENUE

8.      Almost all material events giving rise to this cause of action occurred in Henderson County, North Carolina.

9.      Upon information and belief, defendant Charles McDonald resides in

Henderson County, North Carolina

10.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of North Carolina.

11.     The Asheville Division is the proper division for this case in the United States District Court for the Western District of North Carolina.

## PARTIES

12.     Plaintiff Geoffrey Turner ("Turner") is a citizen and resident of Chesnee, Spartanburg County, South Carolina.

13.     Defendant Henderson County Sheriff Charles McDonald ("McDonald") has been the Sheriff of Henderson County, North Carolina since 2012.  He is being sued in his official capacity.

14.     Defendant John Doe Corporation is a fictitious name for the Surety on the official bond of defendant McDonald as Sheriff of Henderson County pursuant to N.C. Gen. Stat. § 162-8 and § 58-76-5, whose identity is presently unknown to plaintiff.  The true name of the corporation will be substituted for the fictitious name once the corporation's identity is learned.

15.     Upon information and belief, defendant McDonald is protected by a bond issued by the Surety, and the Surety is a corporation authorized to conduct business in the State of North Carolina.  Plaintiff institutes this action individually and, with respect to the claims on the official bond of defendant McDonald, also on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 58-76-5 *et seq.*

16.     Upon information and belief, defendant McDonald is insured by one or more policies of liability insurance purchased pursuant to N.C. Gen. Stat. § 153A-435 or

3

other applicable state law with respect to all acts and omissions complained of herein, or participates in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintains a funded reserve, and to such extent, has waived any official, sovereign, qualified or governmental immunity to which he might otherwise be entitled in his official capacity.

17.     At all times relevant to this Complaint, Turner was an "employee" of defendant McDonald within the meaning of § 101 of the ADAAA, 42 U.S.C. § 12111, and USERRA, 38 U.S.C. § 4303.

18.     Defendant McDonald is an "employer" within the meaning of § 101 of the ADAAA, 42 U.S.C. § 12111, and USERRA, 38 U.S.C. § 4303.

19.     Defendant McDonald has employed two-hundred or more employees for each working day during each of twenty or more calendar weeks in the current or preceding calendar year.

20.     At all times relevant to this Complaint, defendant McDonald employed the following people, who acted as its officers, supervisors, and/or agents and acted within the course and scope of their employment and responsibilities as officers, supervisors, and/or agents with respect to the acts complained of in this Complaint:

    a.     Captain Tim Gordon

    b.     Lieutenant Jeff Patterson

    c.     Lieutenant Michael Marsteller

    d.     Sergeant Larry Pierson

    e.     Corporal Paul Blackwell

    f.     Corporal Josh Hardin

    g.     Deputy Vince Griggs

4

## STATEMENT OF FACTS

21.     Plaintiff Geoffrey Turner ("Turner") served in the United States Army National Guard from March 2000 until March 2005.

22.     Turner had three Active Duty tours.

23.     From October 11, 2000 until March 2, 2001, Turner went through basic training.

24.     From January 7, 2002, until October 13, 2002, Turner served as a Military Police Specialist in Afghanistan as part of the War in Afghanistan.

25.     From March 15, 2003 until March 14, 2004, Turner served as a Military Police Sergeant, Team Leader in Iraq as part of Operation Iraqi Freedom.

26.     Turner was employed as a government contractor from 2005 until 2009.

27.     Turner was employed as a federal officer with the Veterans Administration from 2009 until 2011.

28.     Beginning in 2004 and continuing into 2012, Turner volunteered to provide firearm training to the Henderson County Sheriff's Office SWAT team and other officers.

29.     In 2009, Turner was diagnosed with hearing loss in his left ear.

30.     In 2010, Turner was diagnosed with tinnitus in his left ear.

31.     In October 2011, Turner applied for deputy and detention officer positions with the Henderson County Sheriff's Office.

32.     On his Form F-3 Personal History Statement submitted to the NC Sheriffs' Education and Training Standards Commission, Turner disclosed that he received service-connected disability benefits for a disability rating of 10% for hearing in his left

5

ear.

33.     Immediately prior to Turner's interview with the Henderson County Sheriff's Office, Captain Tim Gordon ("Captain Gordon") informed the entire review board that Turner had problems with his hearing and could not hear well.

34.     Defendant Charles McDonald was appointed to fill the vacant post of Henderson County Sheriff in March 2012.

35.     On or about March 8, 2012, Turner was hired by the Henderson County Sheriff's Department.

36.     Turner was initially hired as a Reserve Deputy.

37.     In approximately June 2012, Turner was diagnosed with Post-Traumatic Stress Disorder (PTSD). Turner's PTSD was very well maintained without any treatment such as counseling or medication.

38.     On or about June 22, 2012, Turner was assigned to work full-time as a deputy with the Uniform Patrol Division.

39.     Turner initially worked on the David Squad.

40.     Turner was a good employee whose work performance on the David Squad was at all times satisfactory.

41.     Turner met expectations and received praise from his supervisors while employed on the David Squad.

42.     In approximately May 2013, Turner was transferred to the Warrant Squad.

43.     When Turner was transferred to the Warrant Squad, he began reporting to the following chain of command: Corporal Paul Blackwell ("Corporal Blackwell"), who reported to Sergeant Larry Pierson ("Sergeant Pierson"), who reported to Lieutenant Jeff

6

Patterson ("Lieutenant Patterson"), who reported to Captain Tim Gordon ("Captain Gordon").

44. Turner's supervisors and co-workers on the Warrant Squad were aware that he had hearing loss and tinnitus.

45. Beginning around the time Turner started with the Warrant Squad, Turner became the target of harassment from Corporal Blackwell, Sergeant Pierson, Captain Gordon, and certain other deputies assigned to the Warrant Squad. These acts of harassment were multiple, frequent, and pervasive harassment of Turner based on his military service and his hearing loss. The following allegations do not purport to be a complete recitation of all of the harassment and derogatory comments and behavior, but are illustrative of the conduct towards Turner.

46. On or about May 31, 2013, Corporal Blackwell met with Turner to discuss his tasks and standards for the upcoming year. During this meeting, Corporal Blackwell Deputy Vince Griggs ("Griggs") told Turner that the standards for working with the Warrant Squad had recently changed, that he could not have worked with the Warrant Squad under the old standards, that he was not qualified for the position, and that his military experience did not prepare him for the position.

47. Turner received a satisfactory Annual Appraisal, which was signed and dated by defendant McDonald on June 11, 2013, with performance ratings of meets all standards.

48. In June 2013, Corporal Blackwell met with Turner to do an initial evaluation.

49. During this meeting, Turner was not given a copy of his Annual Appraisal,

and was not told that he was meeting all standards.

50. During this meeting, Corporal Blackwell told Turner that he was a "rookie," that his military experience did not matter or mean anything, and that he would not "know crap about this job" until he had been in law enforcement for 5 years.

51. During this meeting, Corporal Blackwell told Turner, "You only try so hard at your job to make up for your hearing loss." He also asked Turner, "What are you doing about your hearing loss?"

52. Turner believed that Corporal Blackwell's comments during this meeting, which related to his military service and hearing loss, were made without any basis and constituted harassment. His prior military service, particularly as a Military Police Sergeant, was relevant work experience. He had worked for the Henderson County Sheriff's Office for over a year without any problems or comments related to his hearing loss.

53. Turner complained to Lieutenant Jeff Patterson ("Lieutenant Patterson") about Corporal Blackwell's harassment and derogatory comments related to his military service and his hearing loss.

54. Lieutenant Patterson advised Turner that he had experienced similar harassment based on his military service when he became an officer with the Henderson County Sheriff's Department.

55. Turner advised Lieutenant Patterson that he could not continue to work in an environment where he was harassed based on his military service and hearing loss.

56. Turner asked Lieutenant Patterson for his assistance with preventing the harassment based on his military service and hearing loss.

8

57.     Lieutenant Patterson agreed to transfer Turner to work with him on the late shift.

58.     When Turner was transferred to work on the late shift, he regularly worked only with Lieutenant Patterson serving warrants.

59.     Corporal Blackwell and other officers continued to make derogatory comments about Turner's military service and hearing loss.

60.     When Lieutenant Patterson overheard these derogatory comments about Turner, he attempted to intervene and rebuke the officers who made the comments.

61.     After Turner's transfer to the Warrants Squad, and the ongoing harassment based on his military service and hearing loss, he developed more severe symptoms of PTSD.

62.     On or about July 7, 2013, Turner's close friend, who served with him in the military in Iraq and Afghanistan, committed suicide.

63.     On or about July 8, 2013, Turner sought treatment at the Henderson County Wellness Clinic for stress related to the harassment at work and his friend's suicide.  FNP Julie Baker ("FNP Baker") advised Turner that she believed that he had PTSD and that he should seek counseling, and wrote Turner out of work for several days.

64.     On or about July 8, 2013, FNP Baker provided Turner with an out of work note, addressed to Captain Tim Gordon ("Captain Gordon"), which stated:  Geoff was seen this morning @the Wellness Clinic.  Due to recent stressful events [with] negative physiological symptoms, I advised patient several days of "rest."

65.     On or about July 8, 2013, Turner went to Captain Gordon's house to speak with Captain Gordon and Corporal Blackwell.

9

66. During this conversation, Turner gave Corporal Blackwell his out of work note, and advised them that he was going to take leave.

67. During this conversation, Turner told Corporal Blackwell and Captain Gordon that his friend's suicide was part of the reason that he needed to take leave, but the larger reason for his leave was the stress and pressure that he was under due to Corporal Blackwell harassing and insulting him about his military service, his military background, and his hearing loss.

68. During this conversation, Turner said that he could not fix his hearing loss.

69. During this conversation, Turner told Corporal Blackwell, "I'm telling you this in front of my captain, it's wrong, and it needs to stop."

70. During this conversation, Captain Gordon responded, "[Corporal Blackwell] is your supervisor, and I support everything he said."

71. During this conversation, Turner responded, "It's shameful that any young vet that comes home and comes to work here will have to put up with this same stuff."

72. During this conversation, Captain Gordon told Turner, "With this PTSD maybe this profession is not what's best for you."

73. After this comment, Turner became visibly upset, and responded, "I said what I had to say, and I'm out of here."

74. Turner had never previously informed Captain Gordon that he had been diagnosed with PTSD, and he became concerned that Captain Gordon was either told that he had PTSD, or assumed that he had PTSD.

75. Turner initially sought medical treatment with the Veterans Administration Mental Health Clinic for PTSD on or about July 30, 2013.

10

76.     Turner returned to work from leave in August 2013.

77.     On Turner's first day at work after his leave, Turner was called into a meeting with Captain Gordon, Corporal Blackwell, and Sergeant Larry Pierson ("Sergeant Pierson").

78.     During this meeting, Captain Gordon told Turner, "You know that we need someone in Warrants that delivers."

79.     During this meeting, Turner responded, "I do a good job.  Run the stats, my work speaks for itself."

80.     During this meeting, Captain Gordon told Turner, "We just question your ability to perform in this job because of you taking time off."

81.     During this meeting, Turner responded, "I'm back, I'm here, I'm ready to work."

82.     During this meeting, Captain Gordon told Turner, "Sheriff just wanted to make sure that you knew that if you take any more time off you will be fired."

83.     Turner's symptoms of PTSD increased after being threatened with loss of his job for taking time off of work for medical leave.

84.     On or about January 16, 2014, Turner was called into a meeting with Corporal Blackwell.

85.     During this meeting, Corporal Blackwell asked Turner if he remembered Corporal Blackwell's previous comments about his hearing loss during his initial evaluation.

86.     During this meeting, Turner responded that he remembered Corporal Blackwell's previous comments about his hearing loss, but that there was nothing he

11

could do about his hearing issues.

87. During this meeting, Turner informed Corporal Blackwell that he had a hearing aid for his left ear, but the hearing aid did not help his hearing issues, and only made his hearing worse. The hearing aid amplified sounds, but it also caused a static/white noise sound that actually increased his tinnitus symptoms.

88. During this meeting, Corporal Blackwell said that because Turner had not done anything about his hearing loss, Corporal Blackwell had to document the issue on paper. Corporal Blackwell then gave Turner an "Administrative Complaint and Discipline Form."

89. The Administrative Complaint and Discipline Form summarized an incident that occurred on January 14, 2014, where Turner allegedly could not hear other officers calling his name at the scene of an arrest, and referred to his "hearing issue."

90. The Administrative Complaint and Discipline Form stated that it was a "Record of Counseling" that would be forwarded to the Professional Standards Division.

91. After reviewing the Form, Turner responded that if he had issues hearing the officers at the scene, it was because it was sleeting, the wind was blowing like crazy, and he was on the other side of the house from the officers.

92. During this meeting, Corporal Blackwell stated that he had called out to Turner several times, but that Turner did not hear him.

93. During this meeting, Turner responded that he had also been wearing a toboggan that covered his ears.

94. During this meeting, Turner explained that he had a pending claim with the US Department of Veterans Affairs (VA) for his service connected hearing loss, that

he had received all of the evaluations and treatment that he could receive related to his hearing loss, and that the VA would probably not reevaluate his hearing unless it affected his employment.

95.    During this meeting, Turner told Corporal Blackwell that he would take the Form to his Veterans Service Officer, Mike Murdock ("VSO Murdock").

96.    Turner went to the Henderson County Veterans Service Office, and spoke with VSO Murdock about being counseled at work for his hearing loss.

97.    VSO Murdock said that it was illegal for the Henderson County Sheriff's Office to counsel him for his hearing loss.

98.    During his conversation with VSO Murdock, Turner received a phone call from Captain Gordon, who told him to come back to the Sheriff's Office and bring the Form with him.

99.    When Turner returned to the Sheriff's Office, Captain Gordon met him in the parking lot, and told him that Professional Standards wanted him to get the Form back from Turner.

100.    During this conversation, Captain Gordon told Turner, "This is not a disciplinary action. You are not being counseled or anything."

101.    During this conversation, Turner pointed to the portion of the Form that stated "Record of Counseling," and responded, "What's that?"

102.    During this conversation, Captain Gordon responded that the Form was being recovered, that Turner was not being counseled, and that Turner should not worry about it.

103.    Lieutenant Patterson later advised Turner that Professional Standards

13

contacted Captain Gordon, told them to get the Form back, that it was not authorized, that it was wrong, and that he could not counsel someone for a disability.

104.    On or about January 17, 2014, Turner brought his hearing aid to work. Turner told Corporal Blackwell and Deputy Griggs ("Griggs") that he had previously tried the hearing aid, and that the hearing aid did not work well, but that if it would make them happy, he would try wearing the hearing aid again.

105.    Corporal Blackwell and Griggs told Turner that they would like him to wear the hearing aid at work.

106.    Turner attempted to wear the hearing aid at work, but he did not wear it consistently because it made it more difficult for him to hear out of his left ear.

107.    In early 2014, Griggs had a conversation with Turner about working in the jail.

108.    During this conversation, Griggs informed Turner that he had just spoken to Sergeant Pierson and Corporal Blackwell, that they had previously spoken to Captain Gordon, and that if he did not ask to work part-time in the jail, he would probably be dismissed from the Warrant Squad.

109.    During this conversation, Turner asked Griggs why they wanted to remove him from the Warrant Squad.

110.    During this conversation, Griggs responded that they had spoken with each other and decided that Turner's military background made him unable to deal with the public. Griggs told Turner that because of the time he spent in the military, he was a "military guy," he acted "too militarily," he was "socially challenged," and he failed to adapt to civilian life.

111. During this conversation, Griggs told Turner, "We think that if you go to the jail, you will learn to get along with diverse groups of people."

112. During this conversation, Griggs told Turner that he needed to type an e-mail to inform his chain of command that he wanted to go to work in a jail.

113. During this conversation, Turner responded that he did not want to go to work in a jail.

114. During this conversation, Griggs told Turner that if he did not go to work in the jail, "then they are going to do their best to get rid of you."

115. Turner informed Lieutenant Patterson about his entire conversation with Griggs and the derogatory comments related to his military service.

116. Lieutenant Patterson confronted Captain Gordon about the derogatory comments related to Turner's military service and fought to keep Turner on the Warrants Squad.

117. Patterson later informed Turner that he could stay on the Warrant Squad without going to work in the jail, but that they still wanted to get him out of the Warrant Squad.

118. On or about March 3, 2014, VSO Murdock sent a letter to the Henderson County Sheriff's Office requesting a statement regarding the negative effects of Turner's hearing loss on his ability to perform his job duties, which would be helpful with his pending disability claim.

119. Turner received a second Annual Appraisal in June 2014, which was signed and dated by Corporal Blackwell, Lieutenant Pierson, and Captain Gordon, with performance ratings of 4 (frequently exceeds expectations), 3 (meets all expectations),

15

and 2 (usually meets minimum standards, improvement needed). The overall performance rating was 2.76.

120. Turner received a 2 in the category of "Teamwork," with the following explanation: "GEOFF CAME IN TO A TEAM OF SEASONED OFFICERS AND HAD A HARD TIME LETTING GO OF HIS MILITARY RANK AND STATUS AND WOULD AT TIMES OVER STEP HIS BOUNDS. AND THIS CAUSED SOME FRICTION AMONG THE TEAM. GEOFF CAME TO THIS TEAM WITH A VAST KNOWLEDGE OF MILITARY OPERATIONS, AND HAS SINCE BEEN MAKING THE TRANSITION TO LAW ENFORCEMENT."

121. Turner received a 2 in the category of "Attendance and Punctuality," with the following explanation: "GEOFF HAS HAD SOME PERSONAL ISSUES THIS PAST YEAR, AND HAS AT TIMES NOT BEEN ABLE TO GIVE PROPER NOTICE OF NEEDING TIME OFF."

122. Turner received a 2 in the category of "Communication," with the following explanation: "GEOFF HAS THE ABILITY TO TALK TO PEOPLE AND PUT THEM AT EASE, MOST OF THE TIME. AND HAS GOTTEN BETTER IN HIS ABILITY TO DO SO, BUT OCCASSIONALLY HE IS ABRUPT IN HIS VERBAL INTERACTIONS."

123. On or about August 7, 2014, Captain Gordon sent a letter to VSO Murdock, which stated, in pertinent part: "Deputy Turner is an excellent employee in good standing; however, at times Deputy Turner has issues with a service related hearing loss that is a danger to him and to other officers that he works with. Deputy Turner has made the appropriate efforts to correct the problems but he still remains at risk in this line

16

of work due to his hearing loss. I am requesting that Deputy Turner be given the appropriate level of care to ensure that all that can be done is being done to correct the hearing loss before he or another officer gets hurt due to Deputy Turners lack of ability to hear approaching danger and or verbal warnings from officers while he is performing his duties as a Deputy Sheriff with our agency."

124.    In September 2014, Corporal Blackwell and Sergeant Pierson met with Turner to discuss a sexual harassment complaint that had been made against him. Corporal Blackwell and Sergeant Pierson said that Turner hugged a female and it made her feel odd.  Turner was not given any other details regarding the complaint, but did not recall hugging any females, other than a gas station attendant who gave him a hug.

125.    In September 2014, Turner was called into a meeting with Captain Gordon and Lieutenant Patterson.

126.    During this conversation, Captain Gordon told Turner, "You were counseled on your hearing loss by your supervisor months ago, and you have not responded.  If you continue to not respond, your employment will be evaluated."

127.    During this conversation, Turner asked Captain Gordon if he was referring to the Form that he returned to Captain Gordon and was told not to worry about.

128.    During this conversation, Captain Gordon responded, "That's the one."

129.    During this conversation, Turner told Captain Gordon that he had been harassed about his hearing loss for a year and a half, and that there was nothing else that he could do about his hearing loss.

130.    During this conversation, Captain Gordon told Turner, "Regardless of whether you like to hear it or not, your hearing loss is a problem."

131.    During this conversation, when Turner asked what else Captain Gordon wanted him to do about his hearing loss, Captain Gordon responded, "If I see you with that hearing aid not in your ear, you will be fired."

132.    During this conversation, Captain Gordon told Turner that a sexual harassment complaint had been made against him, and that if any other complaints were made against him, he would fire Turner personally, and the Sheriff would not even be involved.

133.    During this conversation, Captain Gordon told Turner that during the course of teaching his "Don't be a Victim" class to the public, or in any other work environment, "you will not speak of your military background whatsoever."

134.    During this conversation, Captain Gordon told Turner, "You will not talk about any of your military service during the course of your employment with this agency."

135.    During this conversation, Captain Gordon told Turner, "If you speak of your military experience, you will be fired.  You are just Deputy Turner and that's it."

136.    During this conversation, Captain Gordon told Turner, "Mine and the Chief Deputy's specific message to you is to go in a corner and eat a piece of humble pie."

137.    Immediately after this meeting, Captain Gordon told Turner, "If you say a word to anybody that was not in this room, about anything that was said, it will not be in your best interest."

138.    Turner's symptoms of PTSD increased after being threatened with loss of his job for not wearing a hearing aid, for talking about his military experience, or for

18

reporting the harassment to anyone else.

139.    In September 2014, Lieutenant Patterson retired from his position with the Henderson County Sheriff's Office.

140.    In October 2014, Turner had a follow-up audiology assessment and was diagnosed with mild hearing loss in his right ear, and tinnitus in his right ear.

141.    In November 2014, Turner was fitted with new bilateral hearing aids, which were still not effective aids for his hearing loss and tinnitus.

142.    In December 2014, Corporal Blackwell and Deputy Griggs were both promoted and transferred to the Animal Control Squad, and Sergeant Pierson was transferred to another Patrol Squad.

143.    Corporal Josh Hardin ("Corporal Hardin") became the Corporal over the Warrant Squad.

144.    Lieutenant Michael Marsteller ("Lieutenant Marsteller") became Lieutenant over the Warrant Squad.

145.    In March 2015, Turner became a member of the SWAT team.

146.    Members of the SWAT team are called in when an incident presents a significant risk to law enforcement or the public.

147.    Turner had previously trained members of the SWAT team on firearms and woodland tactics.

148.    At that time Turner became a member of the SWAT team, Sergeant Pierson was the SWAT team commander.

149.    In April 2015, on Turner's first day working on the SWAT team, Sergeant Pierson waived Turner over to his car to speak with him.

150. During this conversation, Sergeant Pierson told Turner, "A bunch of people want me to tell you, nobody wants to hear about your military experience, I don't want you demonstrating your military experience, and you most certainly will not say anything about training the team before you came here."

151. Turner's symptoms of PTSD increased after being ordered to not discuss or demonstrate his military experience with members of the SWAT team.

152. In May 2015, Turner spoke with Captain Gordon about the increased stress that he was experiencing due to the ongoing harassment in the workplace.

153. During this conversation, Turner told Captain Gordon that he had spoken with VSO Murdock, and that he said what they were doing to him was illegal.

154. During this conversation, Turner told Captain Gordon that he would like to take a break, or step back down to a reserve deputy position.

155. During this conversation, when Turner asked Captain Gordon what he needed to do to take a break, or step down to a reserve deputy position for a while, Captain Gordon told him that he had to submit a resignation letter resigning from his position as a Warrant Squad deputy and requesting to step down to a Reserve deputy.

156. On or about May 13, 2015, Turner submitted a letter of resignation from his position as a Warrant Squad deputy and a SWAT team member. Turner's resignation letter stated that he intended to continue his service as an active Reserve deputy with the Warrant Squad, and also requested a meeting with defendant McDonald.

157. After defendant McDonald received notice of Turner's resignation letter, he met with Turner to discuss the letter.

158. During this conversation, Turner told defendant McDonald that he was

20

experiencing increased stress and needed to leave his position.

159.    During this conversation, Turner told defendant McDonald that he spoke with Captain Gordon and submitted the resignation letter based on Captain Gordon's recommendation, and that Captain Gordon told him what to write in the letter.

160.    On information and belief, defendant McDonald was aware that Turner was experiencing symptoms related to PTSD.

161.    During this conversation, defendant McDonald told Turner that Captain Gordon should not have told him to submit a resignation letter, and that he did not have to resign in order to drop down to a Reserve deputy position.

162.    During this conversation, defendant McDonald recommended that he could remain in his full-time position and just go out on leave again.

163.    During this conversation, Turner responded that if defendant McDonald told him to take leave, he would do it, but when he came back from leave, he was still going to want to step down to a Reserve deputy position.

164.    During this conversation, defendant McDonald told Turner to go out on FMLA leave and have his physician complete the necessary paperwork.

165.    The Henderson County Sheriff's Office thereafter rescinded Turner's resignation.

166.    On or about May 14, 2015, Turner began taking medication to treat his PTSD, which caused negative side effects including sleeplessness, agitation, angry outbursts, irritation, impulsive behavior, hallucination, and loss of contact with reality.

167.    On or about May 22, 2015, the Henderson County Human Resources Department gave Turner an FMLA Request Form and a Medical Certification to

complete.

168.     On or about May 28, 2015, Turner completed portions of the FMLA Request Form provided the FMLA Request Form and the FMLA Medical Certification form to his health care provider to complete.

169.     On or about June 1, 2015, Turner's health care provider completed the portion of the FMLA Request Form requesting leave for stress, anxiety, and suspected PTSD.

170.     On or about June 1, 2015, Turner's health care provider completed the FMLA Medical Certification Form requesting leave for continued anxiety and stress with need for medication, and estimating medical leave from May 22, 2015 until July 15, 2015.

171.     Turner then provided the FMLA Request Form and Medical Certification to the Henderson County Sheriff's Office.

172.     By FMLA Notices dated June 4, 2015, the Henderson County Human Resources Department notified Turner that his request for FMLA leave was officially approved beginning May 22, 2015, and that he was entitled to 12 weeks of FMLA leave.

173.     Based on the FMLA Notices that Turner received, he was not aware of the date that his FMLA leave was going to expire.

174.     After approving Turner's request for FMLA leave, Defendant never contacted Turner to discuss his medical status, his anticipated return to work date, or his intent to return to work.

175.     Defendant never requested that Turner provide a definitive return-to-work date.

176.    Defendant never requested that Turner return to work on a definitive date.

177.    On or about June 9, 2015, Corporal Hardin called Turner to ask him to come into the Henderson County Sheriff's Office to review and sign annual appraisal.

178.    On or about June 12, 2015, Turner received his third Annual Appraisal in June 2014, which was signed and dated by Corporal Harden, Lieutenant Marsteller, and Captain Gordon, with performance ratings of 4 (frequently exceeds expectations) and 3 (meets all expectations). The overall performance rating was 3.25.

179.    Turner received a 4 in the category of "Communication," with the following explanation:  "I am giving Deputy Turner a 4 in this block due to the fact I worked with him when he first started at the sheriff's Office. At that time there was an issue with communication due to Turners hearing.  He since has recognized the issue and has received assistance with the same and tried to better his weakness."

180.    Turner believed that it was derogatory to reference his hearing loss as an "issue" and "his weakness" and that this constituted harassment.

181.    In early July 2015, Lieutenant Marsteller stopped by Turner's brother's house in Polk County, while wearing his Henderson County Sheriff's Office uniform and in his patrol car, and told Turner's brother to tell Turner that he could not operate his shooting range on Saturdays because his wife had converted to Seventh Day Adventist, and he was not going to allow any shooting on Saturdays.

182.    Lieutenant Marsteller was aware that Turner was in the process of developing a shooting range on his property in Polk County, and that he was planning to teach classes Saturday afternoons to earn income outside of his employment with the Defendant.

23

183. Lieutenant Marsteller did not contact Turner directly to discuss the Saturday classes, but instead approached Turner's brother, who was not in any way associated with the range, while representing himself as an officer outside of Henderson County.

184. While out of work on FMLA leave, Turner posted comments on his personal Facebook page one evening related to the harassment that he had experienced during his employment at the Henderson County Sheriff's Office.

185. Turner posted comments related to Sergeant Pierson telling him to not talk about his military experience or previous training of the SWAT team.

186. Turner posted comments related to Corporal Blackwell telling him in his initial evaluation that his military experience did not mean anything and that he tried so hard at his job to make up for his hearing loss.

187. Turner posted comments related to Lieutenant Marsteller harassing his family.

188. On the morning after Turner posted these comments on Facebook, he decided to delete the comments.

189. Captain Gordon called Turner and asked him what was going on with the Facebook posts that he made.

190. During this conversation, Turner told Captain Gordon that he was placed on new medications that had really "messed him up," but that he had taken the Facebook posts down.

191. During the conversation, Turner told Captain Gordon that his complaints made in the Facebook postings were true, and that he was still upset about all of the

24

harassment that had previously occurred based on his military service and hearing loss.

192.    On or about July 15, 2015, Captain Gordon contacted Turner to discuss his FMLA leave.

193.    During this conversation, Captain Gordon told him that his FMLA leave was going to be ending, and if he did not show up to work on Wednesday, July 22, 2017, he would be absent without official leave and he would be fired.

194.    During this conversation, Turner told Captain Gordon that the harassment was still continuing and he did not know if he could return to work.

195.    During this conversation, Turner explained that Corporal Blackwell and Deputy Griggs had been promoted to other positions where they would be harassing other veterans, Sergeant Pierson continued to harass him on the SWAT team about his military service, and he was still being harassed about his hearing loss.

196.    During this conversation, Turner told Captain Gordon that he had looked up harassment based on disabilities and veterans status, and that they could not harass him about his hearing loss and being in the military.

197.    During this conversation, Captain Gordon responded, "You don't understand, we can talk to you about whatever we want to, whenever we want to."

198.    During this conversation, Turner also told Captain Gordon about his current supervisor, Lieutenant Marsteller, harassing him and his family while he was out on FMLA leave.  Captain Gordon responded that he did not know anything about that situation.

199.    Defendant McDonald later notified Turner that he did not need to report to work on July 22, 2017, and that he wanted to meet with Turner about his leave. They

agreed to meet at a local shooting range.

200.    On or about July 22, 2017, defendant McDonald met with Turner.

201.    During this meeting, defendant McDonald told Turner, "The official reason I came here was to offer you the opportunity to resign, and I don't offer that to everyone."

202.    During this meeting, defendant McDonald told Turner that he could not let Turner return to work as an employee as a result of the Facebook postings.

203.    During this conversation, defendant McDonald told Turner, "Straight up, what you said about your supervisors and specifically posting it on your Facebook page is completely unacceptable."

204.    During this conversation, Turner told defendant McDonald that he was placed on new medications that had really "messed him up," that he was sorry for the postings, and that they were beneath his normal level of professionalism.

205.    During this conversation, Turner told defendant McDonald that everything that he posted about his supervisors on Facebook was true, even though he may not like hearing it.

206.    During this conversation, Turner told defendant McDonald that his supervisors have harassed him over the last three years of his life.

207.    During this conversation, Turner told defendant McDonald that his supervisors have harassed him because of his military service and his hearing loss.

208.    During this conversation, Turner told defendant McDonald that veterans are insulted and degraded at the Sheriff's office and that it's wrong.

209.    During this conversation, defendant McDonald responded, "I prayed about

26

this, and all it is, is you just take things way too personal."

210.    During this conversation, Turner told defendant McDonald that he would resign in lieu of being terminated.

211.    By letter dated July 22, 2015, Turner tendered his resignation. The resignation letter stated, in pertinent part, that he was resigning "due to multiple and consistent experience of veterans discrimination."

212.    On or about July 22, 2015, Turner was constructively discharged by defendant McDonald.

213.    Turner was forced to resign, and did not voluntarily resign, his employment with defendant McDonald.

214.    Turner's PTSD, hearing loss, and tinnitus substantially limit one or more of his major life activities and major bodily functions, including, but not limited to, hearing, thinking, concentrating, interacting with others, and communicating.

215.    At the time of Turner's constructive discharge, he would have been able to perform the essential functions of his position with a reasonable accommodation, and was a "qualified individual with a disability" as defined in the ADA.

216.    Defendant McDonald had notice of Turner's disabilities and his history of disabilities.

217.    Turner was constructively discharged from his job because of his disabilities, his history of disabilities, and being as a person with a disabilities; because of his request and need for accommodations for his disabilities; in retaliation for requesting reasonable accommodations; and because of his opposition to and his complaints about disability discrimination.

218.     Turner was constructively discharged from his job because of his military status and because of his opposition to and his complaints about discrimination based on his military status.

219.     As a result of being constructively discharged from his job, Turner lost wages and benefits of employment.

220.     As a direct and proximate result of the actions of defendant McDonald, as set forth herein, Turner has suffered pecuniary and non-pecuniary harm, including lost and continued loss of compensation and fringe benefits, embarrassment, humiliation, inconvenience, mental suffering, emotional distress, medical expenses, damage to his reputation, and loss of enjoyment of life.

## FIRST CAUSE OF ACTION:
## ADA DISABILITY HARASSMENT & DISCRIMINATION

221.     Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 220 in support of this claim for relief.

222.     The actions of defendant McDonald, as set forth herein, constitute intentional harassment and discrimination against Plaintiff on the basis of his disabilities, his history of disabilities, and defendant McDonald's belief that he had disabilities in violation of the ADA.

223.     The actions of defendant McDonald, as set forth herein, created a hostile and abusive atmosphere toward Plaintiff because of his disabilities and unreasonably interfered with his work performance.

224.     The actions of defendant McDonald, as set forth herein, constituted constructive discharge of Plaintiff's employment with defendant McDonald.

225.     Defendant McDonald is liable for the conduct of his supervisors and

28

deputies, as set forth herein, because of his position and his denial of a tangible employment benefit to Plaintiff.

226. Moreover, defendant McDonald knew or should have known of the conduct of his supervisors and deputies, as set forth herein, including the harassment of Plaintiff and creation of a hostile work environment, and took no remedial action to prevent and correct this conduct.

227. Defendant McDonald engaged in discriminatory practices against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from discrimination and harassment in the workplace.

228. Plaintiff is entitled to all of his benefits of employment, including, but not limited to, back pay, front pay, and insurance benefits, as a proximate result of defendant McDonald's conduct alleged herein.

229. Plaintiff is entitled to recover compensatory damages as provided by the ADA as a proximate result of defendant McDonald's conduct alleged herein.

230. Plaintiff is entitled to recover punitive damages from defendant McDonald as a proximate result of the conduct alleged herein.

231. Plaintiff is further entitled to recover reasonable attorneys' fees, the costs and the expenses of this action, and such interest as may be allowed by law.

<u>SECOND CAUSE OF ACTION:</u>
**ADA RETALIATION**

232. Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 220 in support of this claim for relief.

233. The actions of defendant McDonald, as set forth herein, constitute retaliation against Plaintiff, in violation of the ADA.

234.     Defendant McDonald retaliated against Plaintiff because of his requests for reasonable accommodations for his disabilities, and his complaints about harassment and discrimination toward Plaintiff and the creation of a hostile and abusive atmosphere toward Plaintiff because of his disabilities.

235.     Without limitation, defendant McDonald's retaliation against Plaintiff included constructive discharge of Plaintiff's employment with defendant McDonald.

236.     Defendant McDonald engaged in retaliation against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from retaliation in the workplace.

237.     Plaintiff is entitled to all of his benefits of employment, including, but not limited to, back pay, front pay, and insurance benefits, as a proximate result of Defendant's conduct alleged herein.

238.     Plaintiff is entitled to recover compensatory damages as provided by the ADA as a proximate result of Defendant's conduct alleged herein.

239.     Plaintiff is entitled to recover punitive damages from defendant McDonald as a proximate result of the conduct alleged herein.

240.     Plaintiff is further entitled to recover reasonable attorneys' fees, the costs and the expenses of this action, and such interest as may be allowed by law.

### THIRD CAUSE OF ACTION:
### USERRA HARASSMENT & DISCRIMINATION

241.     Plaintiff hereby incorporates by reference the allegations of paragraphs 1 through 220 in support of this claim for relief.

242.     The actions of defendant McDonald, as set forth herein, constitute intentional harassment and discrimination against Plaintiff on the basis of his prior

military service, in violation of USERRA.

243.     The actions of defendant McDonald, as set forth herein, created a hostile and abusive atmosphere toward Plaintiff because of his prior military service and unreasonably interfered with his work performance.

244.     The actions of defendant McDonald, as set forth herein, constituted constructive discharge of Plaintiff's employment with defendant McDonald.

245.     Defendant McDonald is liable for the conduct of his supervisors and deputies, as set forth herein, because of his position and his denial of a tangible employment benefit to Plaintiff.

246.     Moreover, defendant McDonald knew or should have known of the conduct of his supervisors and deputies, as set forth herein, including the harassment of Plaintiff and creation of a hostile work environment, and took no remedial action to prevent and correct this conduct.

247.     Plaintiff is entitled to all of his benefits of employment, including, but not limited to, back pay, front pay, and insurance benefits, as a proximate result of defendant McDonald's conduct alleged herein.

248.     Defendant McDonald engaged in discriminatory practices against Plaintiff that constitute a willful violation of USERRA.  As a result of defendant McDonald's conduct, as alleged herein, Plaintiff is entitled to recover liquidated damages.

249.     Plaintiff is further entitled to recover reasonable attorneys' fees, the costs and the expenses of this action, and such interest as may be allowed by law.

## FOURTH CAUSE OF ACTION:
### USERRA RETALIATION

250.     Plaintiff hereby incorporates by reference the allegations of paragraphs 1

through 220 in support of this claim for relief.

251.    The actions of defendant McDonald, as set forth herein, constitute retaliation against Plaintiff, in violation of USERRA.

252.    Defendant McDonald retaliated against Plaintiff because of his complaints about harassment and discrimination toward Plaintiff and the creation of a hostile and abusive atmosphere toward Plaintiff because of his prior military service.

253.    Without limitation, defendant McDonald's retaliation against Plaintiff included constructive discharge of Plaintiff's employment with defendant McDonald.

254.    Plaintiff is entitled to all of his benefits of employment, including, but not limited to, back pay, front pay, and insurance benefits, as a proximate result of Defendant's conduct alleged herein.

255.    Defendant McDonald engaged in retaliation against Plaintiff that constitutes a willful violation of USERRA.  As a result of defendant McDonald's conduct, as alleged herein, Plaintiff is entitled to recover liquidated damages.

256.    Plaintiff is further entitled to recover reasonable attorneys' fees, the costs and the expenses of this action, and such interest as may be allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    That all issues of fact raised by this pleading be tried by a jury;

2.    That the Court declare that the acts and practices complained of herein were illegal and prohibit Defendant from engaging in such action in the future;

3.    Actual and compensatory damages under the ADA;

4.    Lost wages and other benefits under USERRA;

5.      Liquidated damages under USERRA;

6.      Reasonable attorney's fees pursuant to federal law;

7.      The costs incurred by Plaintiff in connection with this action;

8.      Such interest as may be allowed by law; and

9.      Such other and further relief as may be just, proper, and necessary to

afford complete relief to Plaintiff.

Respectfully submitted this the 7th day of December, 2017.

/s/ Jessica E. Leaven
Jessica E. Leaven (NC Bar # 27832)
GRIMES TEICH ANDERSON LLP
535 College Street
Asheville, NC 28801
Telephone: (828) 251-0800
Facsimile: (828) 236-9200
Email: leaven@gtalaw.net
Attorney for Plaintiff